Louis L. FRYDMAN, Plaintiff,

v.

DEPARTMENT OF JUSTICE, Defendant.

No. 78–4257–RDR.

United States District Court,
D. Kansas.

May 27, 1994.

Jane Frydman, Lawrence, KS, for plaintiff.

Melanie D. Caro, Office of U.S. Atty., Topeka, KS, Connie R. DeArmond, Office of U.S. Atty., Wichita, KS, for defendant.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This is a Freedom of Information Act (FOIA) case which is now before the court upon plaintiff's motion for attorney's fees and costs.

### FACTUAL BACKGROUND

1. This case involves the efforts of plaintiff, an associate professor at the University of Kansas, and his counsel to discover docu-

ments relating to plaintiff which are held by the Federal Bureau of Investigation (FBI).

2. Plaintiff started with a September 11, 1976 letter to FBI Headquarters requesting "any records stored under my name" or social security number.

3. FBI Headquarters searched their "central records" system. Nothing was found although, as it turns out, one document (the "State Document") was held at FBI Headquarters. Plaintiff was told that "a search of the index to our central records of investigations conducted by the Federal Bureau of Investigation revealed no record identifiable with you." Plaintiff was not informed that there was another records system for documents generated from electronic surveillance, a/k/a ELSUR documents, which was not searched. Nor was plaintiff informed that local FBI field offices maintained records which were not indexed at FBI Headquarters and which were not searched in response to plaintiff's September 11, 1976 letter.

4. Plaintiff then wrote FBI headquarters to request a search of local FBI offices "in Lawrence, Kansas; Topeka, Kansas; and Kansas City, Kansas and Missouri." FBI Headquarters replied by directing plaintiff how to contact the local offices directly.

5. Plaintiff then wrote the FBI field office in Kansas City, Missouri (KCFO) on October 26, 1976, asking whether there was a "file under my name or social security number or whether my name or social security number is listed or connected with other current files." Plaintiff also asked for the contents of any such file. At the request of KCFO, plaintiff later supplied background information including: date of birth; date of immigration; date of naturalization; places of residence; social security number; and current profession.

6. As it turns out, KCFO had two documents concerning plaintiff. However, on November 12, 1976, KCFO disclosed, with a letter by Special Agent Bill Williams, an excised copy of only one document from its files. The document was ultimately released in virtually complete form with only the name of an FBI agent deleted. The docu-

ment, which will be referred to hereafter as the "Released Document" or "RD" reads essentially as follows:

United States Government Memorandum

Date: 3–11–75

To: SAC, KANSAS CITY (105–4641)

From: SA [excised]

Subject: CHANGED—INTEROFFICE

LOUIS FRYDMAN, aka, <u>Lou Frydman 105–4641</u>

Lou Frydman

IS–PO

00:KC

Re WFO letter to Albany, 2–11–75.

Title is marked changed to set forth name of subject as LOUIS FRYDMAN, formerly captioned, LOU FRYDMAN.

<u>It is noted LOU FRYDMAN, 139 Providence Road, Lawrence, Kansas 66044, indicated he plans to study in Poland for several months.</u>

<u>On 3–3–75, the 1974–75 University of Kansas (KU), Lawrence, Kansas, Faculty/Staff/Students Directory was reviewed and the following noted:</u>

<u>LOUIS FRYDMAN, Associate Professor, Social Welfare, 307 Twente Hall, 864–3712, home, 139 Providence (Providence Road is correct street name), Lawrence, Kansas, 842–4088.</u>

In accordance with M of I, subject does not meet the guidelines for further investigation and therefore, this case is being considered closed.

1—105–4641

1—100–10798

BLS/bls

(2)

Only the underlined text of this document was released to plaintiff on November 12, 1976. Defendant justified the excisions under two subsections of Title 5, U.S.Code, Section 552:

(b)(2) Materials related solely to the internal [personnel] rules and practices of the FBI;

and

(b)(7) Investigatory records compiled for law enforcement purposes, the disclosure of which would:

(C) Constitute an unwarranted invasion of personal privacy of another person.

7. It should be noted that the Released Document makes reference to another document regarding plaintiff, the "WFO letter to Albany, 2–11–75." Of course, plaintiff was not aware of this until that part of the Released Document was disclosed to him.

8. Plaintiff administratively appealed the excisions on the Released Document. Because of plaintiff's administrative appeal, KCFO was directed by FBI Headquarters to forward all material relating to plaintiff's request to FBI Headquarters. This was done on December 15, 1977.

9. Plaintiff prevailed in his administrative appeal. With a letter dated January 13, 1978, the entirety of RD was disclosed to plaintiff with the exception of the name of the FBI agent.

10. Oddly, in another letter dated January 16, 1978, which again informed plaintiff of his success on administrative appeal, there was a backhanded reference to a second document relating to plaintiff, as if plaintiff were already aware of its existence. This is the second document pertaining to plaintiff at KCFO. The letter stated in part:

As a result of discussions between Bureau personnel and members of my staff, the one page previously released to you will now be re-released with only the name of an F.B.I. Special Agent excised in order to protect his privacy. 5 U.S.C. 552(b)(7)(C). The remaining document pertaining to you is classified and I am affirming the denial of access to it on the basis of 5 U.S.C. 552(b)(1).

No attempt to explain the content, form, date or other details about the "remaining document" was made. Of course, plaintiff could have determined that another document mentioning him once existed when he saw the reference to the "WFO letter to Albany" in the re-released copy of RD. It has since been determined that the "remaining document" mentioned in the letter is a copy of the "WFO letter to Albany." This document shall be referred to hereinafter as the "Classified Document" or "CD."

11. On February 26, 1978, plaintiff wrote to the Acting Deputy Attorney General with questions concerning the letter of January 16, 1978. Plaintiff asked questions about the Classified Document and questions about the abbreviations used on the Released Document. There was no response to this letter.

12. Plaintiff filed this lawsuit on September 11, 1978.

13. Special Agent Michael W. Twibell signed an affidavit dated June 6, 1979 which stated that he processed plaintiff's FOIA request to KCFO and found one closed file with two documents. He further stated that he prepared the November 12, 1976 letter to plaintiff for Special Agent Bill Williams' signature, and that in the letter he "omitted as an oversight, to advise" plaintiff of the Classified Document. This representation differs from the statements of defendant's counsel in defendant's first motion for summary judgment filed March 13, 1979 that the Classified Document "was not *found* in the initial search through oversight." Doc.No. 13 at p. 2 ¶ 3 (emphasis added). It was defendant's position in the first motion for summary judgment that the Classified Document was first found with another document (the "State Document" discussed below) during an appeals review process on November 7, 1978. After the court noted this could not have happened since the Classified Document was acknowledged to plaintiff in a *January 16*, 1978 letter, defendant's position was corrected in a supplement to the summary judgment motion. The supplement referred to the affidavit from Michael Twibell. Apparently, defendant decided that no such explanation of the "oversight" was needed when the existence of the Classified Document was first mentioned in defendant's letter of January 16, 1978.

14. After examining the Classified Document *in camera*, the court determined that its contents were exempt from disclosure under FOIA. Several years later, at plaintiff's request, the court directed that information regarding the number of pages, number of pages mentioning plaintiff, and the

year of origination be released to plaintiff. Doc. No. 167.

15. Defendant's first motion for summary judgment revealed for the first time on March 13, 1979 the existence of a *third* document relating to plaintiff. This document, which was found at FBI Headquarters, originated from the State Department. This document shall be referred to hereinafter as the "State Document" or "SD." There are two pages. One page is a form used by a Polish citizen making application for a visa to visit the United States. The form was completed in 1963 and makes reference to plaintiff as a friend of the visa applicant. The second page is a request from the State Department to the FBI to check the identity of plaintiff in connection with the visa application.

16. The discussion of the State Document in defendant's first summary judgment motion and in the affidavits supporting the summary judgment motion created confusion in this case. This confusion involved three points: when the SD was found; when the CD was found; and why they were not found sooner. Defendant's counsel indicated in the motion for summary judgment (Doc. No. 13) that the SD was discovered at the same time as the Classified Document (i.e., prior to January 16, 1978), during a review of plaintiff's administrative appeal of the excisions on the Released Document. This was not correct and conflicted with the affidavit of Special Agent Hawkes, which accompanied the summary judgment motion and stated that the SD was found on November 7, 1978 when a recheck of files was done after the filing of this case. Another way of looking at this is that counsel's statement implied that the Classified Document was discovered at the same time as the SD which, according to the Hawkes affidavit, was found on November 7, 1978. Of course, this was incorrect. We noted previously that the court pointed out this error in an order ruling upon the first summary judgment motion. Doc. No. 22 at p. 10. This, in turn, led to the previously mentioned Twibell affidavit and an affidavit from Special Agent Wade Homesley of the FBI.

17. The affidavit of Agent Twibell explained why the CD was not found sooner.

Actually, it was found when the RD was found, but Agent Twibell omitted as an oversight any reference to it in the letter of Agent Williams to plaintiff. The affidavit of Agent Homesley corrected the original explanation for why the State Document was not found sooner.

18. According to the Homesley affidavit, which the court finds persuasive, defendant discovered the State Document during an extra search which was conducted in connection with this litigation at the direction of Agent Homesley on November 7, 1978. Even so, defendant waited four months to mention the State Document to plaintiff after it was discovered. Nothing is offered to explain this delay. The SD was released first in excised form on March 27, 1979 and later, after administrative appeal, it was released without excision by the Department of State.

19. In defendant's first motion for summary judgment, counsel for defendant stated that a name variation was the cause for overlooking the State Document in the first instance. The document listed the name "Louis Lolek Frydman." Plaintiff's FOIA request listed his name in a slightly different fashion, "Louis L. Frydman (Until 1953: Lolek Frydman)." This explanation was supported with the Hawkes affidavit which was filed with the summary judgment motion.

20. In the affidavit filed on June 14, 1979, Agent Homesley blamed the delay in finding the State Document upon a misfiled index card. He stated that, although the name on the index card for the State Document is slightly different from the name plaintiff supplied the FBI, the index card normally would have been discovered in a search of the central records system. (Indeed, later a document pertaining to plaintiff was found, although it was indexed under the name "Lewis Frydman".) In this instance, he believes the card was misfiled when the initial search occurred. It had been correctly filed by November 7, 1978 when a second search was conducted to prepare a litigation report in connection with this litigation.

21. When the Homesley affidavit was originally prepared, it was intended that a

copy of the misfiled index card be supplied to plaintiff. At some point after the affidavit had been prepared and signed, this decision was reversed. The end of the fourth paragraph on page three of the affidavit was deleted. This paragraph indicated that a copy of the card was being supplied. A photocopy of the third page of the affidavit, which did not show the deleted paragraph, was substituted for the third page of the original affidavit. Unfortunately, for several years that followed, many persons working for defendant incorrectly thought, and even represented to the court, that plaintiff had been supplied a copy of the index card. This misunderstanding apparently occurred because complete copies of the Homesley affidavit were maintained in the litigation files, and these copies were not compared to the affidavit with the deleted paragraph that was filed with the court in 1979. Eventually, defendant offered to supply plaintiff with "another" copy of the "Homesley index card." On January 3, 1990, defendant was directed to do so by the court. Doc. No. 137.

22. To reiterate, an unexcised copy of the State Document was released to plaintiff on or about June 28, 1979 after administrative review by the Department of State. Until its release by the Department of State, defendant resisted the release of the document, which was unclassified and dated back to 1963.

23. On June 18, 1979, plaintiff made an FOIA request to the Washington, D.C. Field Office (WFO) of the FBI. The request sought the disclosure of whether there was a "file under my name and social security number and/or whether my name or social security number is listed or connected with any other file." Plaintiff received a prompt reply on June 22, 1979 that:

> Your name does not appear in [the Central Records System of the Washington Field Office]. However, a single mention of your name was located in a file pertaining to an investigation of other persons, organizations or events. Our term for this type of record is a "see reference." This "see reference" material, consisting of one page, is being withheld in its entirety in order to protect material exempted from disclosure

by the following subsection of Title 5, United States Code, Section 552[ (b)(1) ] . . .

This document shall be hereinafter referred to as the "First See Reference document" or "FSR."

24. Plaintiff administratively appealed the denial of disclosure of the FSR. Plaintiff's appeal was denied.

25. On October 7, 1981, plaintiff made an FOIA request to WFO asking for "any information including ELSUR." As noted earlier, "ELSUR" refers to electronic surveillance information. Defendant promptly replied that *two* documents were discovered. One was the FSR previously described. The second document was also designated a "see reference" document and was declared exempt from release under the provisions of 5 U.S.C. § 552(b)(1). The second document shall hereinafter be referred to as the "Second See Reference document" or "SSR."

26. On August 28, 1981, plaintiff wrote to FBI Headquarters asking for a search of the ELSUR system. FBI Headquarters acknowledged receipt of plaintiff's letter on September 21, 1981. On December 17, 1981, plaintiff administratively appealed the delay in processing his search request. On February 10, 1982, the Department of Justice acknowledged plaintiff's administrative appeal. About six weeks later, on March 25, 1982, plaintiff was informed that as a result of his search request, ELSUR material was being processed. Plaintiff asked for an explanation of this letter and was informed that the ELSUR material was still being processed. Ultimately, on June 30, 1982, the Department of Justice told plaintiff that the ELSUR material would be withheld in its entirety pursuant to 5 U.S.C. § 552(b)(1). However, no description of the ELSUR material (e.g., how many documents, date of the documents, number of pages, or relation of documents to ones previously disclosed to plaintiff) was given.

27. As late as March 1990, defendant referred to the ELSUR documents as "materials of an unknown nature." See Declaration of Special Agent Angus Llewellyn attached to Doc. No. 146. It was not until July 25, 1990, in response to a court order (Doc. No.

154) over the objection of defendant, that defendant disclosed to plaintiff the number and date of origin of the ELSUR documents. Two ELSUR documents were identified. One was the "SSR." The other document shall be referred to hereinafter as the "Third See Reference document" or "TSR." Defendant also disclosed the number of references to plaintiff in the documents, although defendant mistakenly stated that the references appeared on "page one" of the documents, instead of "one page" of the documents.

28. The court has approved defendant's claim that FSR, SSR, and TSR are exempt from disclosure.

29. On March 21, 1991, over the opposition of defendant, the court ordered defendant to produce index cards pertaining to plaintiff. Fifty index cards from FBI headquarters and various field offices were produced. It appears that most of these index cards refer to FOIA inquiries by plaintiff. Plaintiff has speculated that the index cards from the New York and New Haven field offices refer to documents which have not yet been produced. Plaintiff notes that some of the cards from the New York field office are marked "sensitive." But, the court does not believe defendant is withholding documents from plaintiff. The court believes the index cards refer to FOIA requests by plaintiff or the processing of those requests.

*LEGAL STANDARDS*

30. The standards applied to the recovery of attorney's fees in a FOIA action were discussed recently in *Long v. United States Internal Revenue Service,* 932 F.2d 1309, 1313 (9th Cir.1991) and shall be set forth at length:

> Absent proof that an opponent acted in bad faith, a prevailing party ordinarily is not entitled to recover its attorney's fees and related costs unless they are expressly provided for by statute or contract. *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 126[,] 94 S.Ct. 2157, 2163, 40 L.Ed.2d 703 (1974). Although the FOIA provides for an award of fees "reasonably incurred in any case … in which the complainant has substantially prevailed," 5 U.S.C. § 552(a)(4)(E), it does not mandate recovery of fees in such in-

stances. In order to receive an award of fees, a prevailing party in a FOIA action must demonstrate both *eligibility* for and *entitlement* to such a recovery. *Church of Scientology v. United States Postal Serv.,* 700 F.2d 486, 492 (9th Cir.1983).

A complainant in a FOIA action is deemed to be eligible for fees if he has "substantially prevailed" on his claim. *Id.* at 489. This means that the plaintiff must present "convincing evidence" that two threshold conditions have been met: he must prove that (1) his filing of the FOIA action was necessary to obtain the information sought and (2) the action had a *"substantial causative* effect" on the ultimate receipt of that information. *Id.* (emphasis in original).

If the plaintiff demonstrates that he is eligible for fees (*i.e.,* proves that he has "substantially prevailed"), "the district court may, in the exercise of its discretion, determine that the [complainant] is *entitled* to an award of attorney's fees." *Id.* at 492 (emphasis in original). In exercising its discretion on the question of entitlement to fees, the district court must consider four criteria: (1) the public benefit from disclosure, (2) any commercial benefit to the plaintiff resulting from disclosure, (3) the nature of the plaintiff's interest in the disclosed records, and (4) whether the government's withholding of the records had a reasonable basis in law. *United Ass'n of Journeymen & Apprentices, Plumbing & Pipefitting Indus., Local 598 v. Department of the Army,* 841 F.2d 1459, 1461 (9th Cir.1988); *Church of Scientology,* 700 F.2d at 492. These four criteria are not exhaustive, however, and the court may take into consideration " 'whatever factors it deems relevant in determining whether an award of attorney's fees is appropriate.' " *Id.* (quoting *Exner v. FBI,* 443 F.Supp. 1349, 1352 (S.D.Cal.1978), *aff'd,* 612 F.2d 1202 (9th Cir.1980)).

*See also Aviation Data Service v. F.A.A.,* 687 F.2d 1319, 1321–22 (10th Cir.1982).

*ELIGIBILITY FOR FEES*

■ 31. Although we think it is a close question, we conclude that plaintiff has dem-

onstrated with convincing evidence his eligibility for fees. Plaintiff has proven that without filing this FOIA action, he would not have received the State Document, the index cards, or the information he received about the documents (the CD, FSR, SSR and TSR) which the court ruled were exempt from full disclosure. Defendant would not have found the State Document if this litigation had not spurred a second hunt for documents at FBI Headquarters. The release of the rest of the information and index cards was obtained through court orders.

32. The court is obliged to consider the quality or substance of the information released. *Union of Concerned Scientists v. U.S. N.R.C.*, 824 F.2d 1219, 1226 (D.C.Cir. 1987). We are reluctant to hold that the release of information in this case is tantamount to substantial success upon plaintiff's claims for two reasons. First, plaintiff asked for much more information than he received or was entitled to receive. Second, the information plaintiff did receive had debatable substantive value. The text of the CD, FSR, SSR and TSR was held exempt from disclosure. Plaintiff learned only a few facts about these records. While the SD was found because of this litigation, its release occurred primarily because of an administrative procedure. Moreover, the SD only mentioned plaintiff as a friend known by someone making application for a visa. The RD was released *prior* to this litigation. Therefore, this litigation was not necessary to its release. Finally, the production of the index cards was related to plaintiff's attempt to discover the existence of previously undisclosed documents and to prove defendant's bad faith. There was no substantive information on the cards which was valuable to plaintiff or the public. Nevertheless, to reiterate, plaintiff did receive information over the opposition of defendant which he would not have received if this litigation was not filed. While we question the quality or substance of the information released, we find that it had significant value for plaintiff. Therefore, the court concludes that plaintiff substantially prevailed.

## ENTITLEMENT TO FEES

### Public benefit

33. In gauging plaintiff's entitlement to attorney's fees, the court must look at several factors. One factor is public benefit. The court does not believe there is a significant public benefit from the disclosures made as a result of this case. Plaintiff has pursued a highly personalized matter in this case. Although he has suggested that he might write an article or book about this episode in his life, this is too speculative to warrant much weight. It has been stated that Congress envisioned the FOIA as providing information which would assist citizens in making vital political choices. *See Blue v. Bureau of Prisons*, 570 F.2d 529 (5th Cir. 1978). This case does not involve that kind of information. We conclude that there is no significant public benefit which weighs in favor of a fee award in this case. *See Polynesian Cultural Center v. NLRB*, 600 F.2d 1327, 1330 (9th Cir.1979) (trivial public benefit does not weigh heavily in favor of a fee award).

### Private or commercial interest

34. There is no obvious commercial benefit from the receipt of this information. This factor might weigh in favor of an award of fees, except that plaintiff's interest appears purely personal as opposed to public interest oriented. "[W]hen a litigant seeks disclosure for a commercial benefit or out of other personal motives, an award of attorney's fees is generally inappropriate." *Tax Analysts v. U.S. Dept. of Justice*, 965 F.2d 1092, 1095 (D.C.Cir.1992); *see also Whalen v. I.R.S.*, 1993 WL 532506, 1993 U.S.Dist. LEXIS 17953 (N.D.Ill.1993) ("Generally, courts are disinclined to award fees and costs under FOIA where the benefit to the public is merely incidental or secondary to the private commercial benefit to plaintiff.").

### Nature of plaintiff's interest

35. The third factor, the nature of plaintiff's interest in the disclosed records, is closely related to the second factor. " 'The private self-interest motive of, and often pecuniary benefit to, the complainant will be sufficient to insure the vindication of the rights given in the FOIA.' " *Solone v. I.R.S.*,

830 F.Supp. 1141, 1143 (N.D.Ill.1993) (quoting S.Rep.No. 854, 93d Cong., 2d Sess. 17 (1974)). Although plaintiff's interest in the information in this case is not pecuniary, it is strictly personal. "The FOIA was enacted to provide information to the public and not to benefit private litigants." *Id.* Therefore, plaintiff's interest in the disclosed records is not a compelling reason to award attorney's fees in this case.

*Government's conduct during the litigation*

■■■ 36. The final factor for consideration is the government's basis for withholding records. If the government's position in refusing disclosure is correct, that is dispositive. Fees will not be awarded. *Chesapeake Bay Foundation v. Dept. of Agriculture,* 11 F.3d 211, 216 (D.C.Cir.1993). If the government's position has a colorable basis, although it did not prevail, then the reasonableness of the government's position will be weighed along with the other factors in the process. *Id.* Fees may be awarded in cases where, even though some other factors point against granting fees, the government is found to have been recalcitrant in opposition to a valid claim or to have otherwise engaged in obdurate behavior. *Cazalas v. Dept. of Justice,* 709 F.2d 1051, 1054 (5th Cir.1983) (quoting Senate Report at 19). We will expand our consideration of the government's basis for denying disclosure of documents to consider the government's conduct as a whole in this litigation.

*Basis for withholding records*

37. We shall first discuss the basis for the government's refusal to disclose certain records. Since this litigation was filed, the only document other than index cards which has been disclosed to plaintiff is the SD, a document which originated from the State Department and which was referred to the State Department before it was eventually released. The government was somewhat sluggish in disclosing the existence of the document to plaintiff. It waited three to four months after the document was discovered to inform plaintiff of the document. Thereafter, the FBI referred the question of disclosing the document to the State Department since

the document originated from that agency. From the court's review of the case law and other authorities, the referral practice used by the FBI in this case is commonplace. *See* J. Franklin and R. Bouchard, THE FREEDOM OF INFORMATION AND PRIVACY ACTS § 1.03 at pp. 1–28 and 1–29 (1994). At the time this happened, the court noted in an order that there was little authority on one side or the other regarding the ability or authority of one agency to disclose documents which originated from another agency. See Doc. No. 22 at p. 8. In 1983, four years later, the D.C. Circuit Court of Appeals noted that "no appellate court has expressed an opinion on the question of the legal status of documents prepared by one agency in the possession of another." *McGehee v. C.I.A.,* 697 F.2d 1095, 1106 (D.C.Cir.1983). The court in *McGehee* eventually held that such documents were "agency records" under the FOIA, but it did not flatly disapprove a referral procedure; indeed, it suggested one. Accordingly, although the government may have been sluggish at first, we find a colorable basis for the delay in disclosing the SD to plaintiff.

38. The government also resisted disclosing the index cards to plaintiff on the grounds that these cards were not agency records under the FOIA. Courts have often commented upon the lack of guidance from Congress and other case law regarding what an "agency record" is for purposes of the FOIA. E.g., *Bureau of National Affairs v. U.S. Dept. of Justice,* 742 F.2d 1484, 1488 (D.C.Cir.1984). Although the government did not offer case authority to support its position regarding the index cards, we believe the government's position had a colorable basis. There is little, if any, case authority which directly holds contrary to the government's position. Moreover, it is clear that index cards do not fall within the mainstream of the "records" contemplated by Congress when the FOIA was passed. In the instant case, the cards were requested by plaintiff as a discovery measure; not for their substantive information, but as a device to prove defendant's alleged bad faith in delaying or denying the disclosure of other documents. Even considering the release of index cards under discovery principles, we

believe the government had reasonable grounds to contest the underlying relevance of the index cards. These grounds were overruled in the spirit of allowing plaintiff latitude in discovery in this case. The mistakes of the government in handling this matter and the difficulty in obtaining information about documents which have not been released warranted such leeway, in the court's opinion. Nevertheless, we believe the government had a reasonable basis for opposing the disclosure of the index cards.

39. The government also resisted, again without citing case authority, plaintiff's request for information regarding documents which the court had declared exempt from disclosure. The court believes the government's opposition to disclosing the date of the documents had a reasonable basis, although the court did order the release of the year of origin of the documents. The purpose of the government's opposition was to avoid the disclosure of information from which methods of gathering intelligence could be deduced. Although the court disagreed with the lengths to which the government carried its opposition, the court does not believe the government's position was unreasonable.

*Failure to search ELSUR indexes without a specific request*

40. The court shall now address many of the other arguments plaintiff has advanced to support his contention that defendant has acted in bad faith. Plaintiff argues that defendant acted in bad faith by not searching the ELSUR indexes in response to plaintiff's general request for documents relating to him. In response to most of plaintiff's general requests, FBI offices only searched their central indexes. In most instances, the ELSUR indexes were not searched unless plaintiff made a specific request for a search of the ELSUR indexes. Furthermore, the FBI did not inform plaintiff that ELSUR indexes existed but were *not* searched in response to his initial request. The court acknowledges one case (which postdates the searches performed in this case) where the FBI was criticized for failing to search ELSUR indices in response to a general request for a search for documents. *Biberman v. F.B.I.,*

528 F.Supp. 1140, 1144–45 (S.D.N.Y.1982). In another case, the FBI searched ELSUR indexes in response to a general search request. *Marks v. United States Dept. of Justice,* 578 F.2d 261 (9th Cir.1978). Indeed, in this case it appears that ELSUR indexes at the Atlanta and Pittsburgh FBI field offices were searched when plaintiff directed general search requests to those offices. But, this was not done at other field offices and at FBI headquarters when plaintiff made general search requests. The practice of not searching ELSUR indexes unless a specific request for such a search is made seems to have been followed in other cases. *Lawyer's Comm. for Human Rights v. I.N.S.,* 721 F.Supp. 552, 567 n. 12 (S.D.N.Y.1989); *Friedman v. FBI,* 605 F.Supp. 306, 311 (N.D.Ga.1981); *Pratt v. Webster,* 508 F.Supp. 751 (D.D.C.1981); *see also,* J. Franklin and R. Bouchard, *supra* at § 1.16[5], p. 1–325 (citing unpublished cases). The court in *Lawyer's Comm. for Human Rights v. I.N.S.* specifically stated that this search strategy was reasonable.

41. The duty of defendant was to make a diligent effort calculated to uncover the requested documents. *Miller v. United States Dept. of State,* 779 F.2d 1378, 1385 (8th Cir. 1985). "There is no requirement that an agency search every record system." *Oglesby v. U.S. Dept. of Army,* 920 F.2d 57, 68 (D.C.Cir.1990). The belated discovery of documents during litigation is not considered *per se* evidence of bad faith. *Miller, supra,* 779 F.2d at 1386. Indeed, the disclosure of documents following a broadened search request has been considered evidence of good faith. *Id.* "[T]here is no general requirement that an agency search secondary references or variant spellings." *Maynard v. C.I.A.,* 986 F.2d 547, 560 (1st Cir.1993). "Nor is there any requirement that an agency conduct further searches on the basis of unspecified 'clues' in released documents." *Id.*

42. In the case at bar, one can make an argument that defendant did not act reasonably when it failed to search the ELSUR indexes in response to plaintiff's first search request. One may also assert that a person knowledgeable in FBI methods and procedures would have conducted a search of EL-

SUR indexes because of the content of the RD and CD. These arguments are reasonable, but they do not prove recalcitrant or obdurate behavior by defendant. The information supplied by plaintiff did not direct defendant's attention to electronic surveillance. Defendant's search practices followed a pattern common to other cases. The court is unaware of any criticism of the scope of the search by any court at the time the searches were conducted. Eventually, when plaintiff broadened his request to expressly include ELSUR documents, defendant willingly executed the search. Looking at all the circumstances, we agree that defendant could have done more than it did in response to plaintiff's general search request. But, we do not think defendant was indifferent or stubbornly resistant to its responsibilities under the law. In sum, we do not believe bad faith was exhibited by defendant's failure to make a search of ELSUR indexes in response to plaintiff's initial search request.

*Statements in defendant's answer and in motions for summary judgment*

43. Plaintiff contends that defendant's bad faith in this case is illustrated by the answer to plaintiff's complaint and by statements made in defendant's motions for summary judgment. We disagree. The best argument for plaintiff in this area is based on defendant's first motion for summary judgment. In this motion, defendant's effort to explain the discovery of three different documents (RD, CD and SD) which were identified to plaintiff at three different times, was inconsistent and confusing. But, we do not believe this represented intentional or reckless resistance to defendant's FOIA obligations. The inconsistencies were promptly investigated and alleviated with the Twibell and Homesley affidavits. On the other hand, the court must remark that plaintiff has often strained to place a bad faith interpretation upon defendant's answer and other summary judgment allegations. Plaintiff's attack upon certain "uncontested facts" presented in defendant's second and third summary judgment motions at pp. 101–103 of plaintiff's brief in favor of attorney's fees, simply does not withstand scrutiny. Further, although the court in an early order in this case (Doc. No. 22) did not find bad faith in defendant's

answer to plaintiff's complaint, plaintiff has persisted with this claim.

*Reference to "administrative markings" on the RD*

44. Plaintiff has often contested defendant's repeated reference to the material deleted when the RD was originally released to plaintiff as "administrative markings." The court would not characterize all of the material deleted as "administrative markings." But, the court does not see this as a major point. The RD was released to plaintiff in virtual entirety prior to the instigation of this litigation. We believe this is a much stronger sign of good faith than the consistent but arguably overbroad reference to "administrative markings" is evidence of bad faith.

*Refusal to produce an FBI manual*

45. Plaintiff has criticized the defendant's refusal to produce an FBI manual which supposedly supported defendant's initial actions regarding the RD. The court has previously upheld defendant's position. We find that the FBI manual provisions regarding a document which was fully released to plaintiff before this case was filed is of minimal relevance to the case. We do not believe defendant's opposition to producing the manual is strong evidence of bad faith.

*Refusal to provide indexing information*

46. Plaintiff points out that defendant has refused to describe how the CD is indexed at the Albany Field Office. The CD is correspondence from the Washington Field Office to the Albany Field Office. Defendant is not obligated to describe how specific documents are indexed in its various field offices. However, defendant has provided general information regarding its indexing systems. We do not believe the refusal to answer plaintiff's specific question about how a certain document may be indexed strongly indicates bad faith. The court notes that defendant has produced a copy of the CD for the court's inspection, and the court has upheld defendant's claim that the CD's contents are exempt.

*Alleged secret indexing system*

47. Plaintiff asserts that defendant must have a secret indexing system which it has

employed to conceal documents from plaintiff or others making FOIA requests. This assertion is too speculative to have weight. *See Safecard Services, Inc. v. S.E.C.*, 926 F.2d 1197, 1200 (D.C.Cir.1991); *Bay Area Lawyers Alliance v. Dept. of State*, 818 F.Supp. 1291, 1295 (N.D.Cal.1992).

*Alleged undisclosed document*

48. Plaintiff argues that there must exist a security risk report about him which has not been produced by defendant. Again, this is speculation which does not deserve evidentiary force. *Ground Saucer Watch, Inc. v. C.I.A.*, 692 F.2d 770, 772 (D.C.Cir.1981). Furthermore, it is not supported by the court's review of the documents in this case.

*Age of records*

49. Plaintiff asks why defendant persists in opposing the disclosure of old records. This is a legitimate question. But, the government has a legitimate answer. The disclosure of the documents may reveal intelligence gathering methods which are still employed by the government. *Maynard v. C.I.A., supra*, 986 F.2d at 555 n. 6 ("We do not agree with the district court that merely because the information here is thirty years old, it cannot detrimentally reveal intelligence sources or methods.").

*Affidavits not based on personal knowledge*

50. Plaintiff has claimed that defendant acted in bad faith because it submitted affidavits to the court which were not based on personal knowledge. This is not required. *Maynard v. C.I.A., supra*, 986 F.2d at 560; *Safecard Services, Inc. v. S.E.C., supra*, 926 F.2d at 1201 (D.C.Cir.1991). We do not believe it demonstrates bad faith. However, it is clear that the failure to submit affidavits based upon direct personal knowledge may have caused at least part of the confusion that has marked this case.

*The Hawkes affidavit*

51. Plaintiff asserts that the Hawkes affidavit, which was used to support defendant's first motion for summary judgment, is evidence of the defendant's bad faith in this case. In this affidavit, Special Agent Hawkes attributed the failure to find the SD during the first search of the FBI Headquar-

ters general indexes to the name variation on the index card. Plaintiff had submitted the names "Louis L. Frydman or Lolek Frydman," but the document referred to plaintiff as "Louis Lolek Frydman." The Hawkes affidavit was presented to the court on March 13, 1979. On June 8, 1979, Special Agent Homesley of FBI Headquarters signed an affidavit with a different explanation of why the SD was not found during the first search of the general indexes at FBI Headquarters. Agent Homesley stated that he ordered a search of the general indexes after plaintiff filed this lawsuit and the lawsuit was assigned to him for handling. The search was conducted on November 7, 1978, and the SD was located. He also stated that he ordered a second, more thorough search, but no additional documents were discovered. Agent Homesley explained that normally the reference to the document would have been picked up even though the names provided by plaintiff were slightly different from plaintiff's name in the SD. Agent Homesley attributed the failure to find the SD during the first search to the misfiling of the index card referring to the document. Apparently, the index card had been misfiled out of alphabetical order when the initial search happened and then correctly refiled on December 28, 1977, prior to the search ordered by Agent Homesley. Despite the inconsistency between the two affidavits, for considerable time after the Homesley affidavit, defendant continued to refer to both the Hawkes and the Homesley explanation to describe why the SD was not discovered during the first search of the records of FBI Headquarters. We believe the Hawkes affidavit reflects a failure by the FBI to thoroughly examine why the SD was not discovered during the first search of FBI Headquarters' general indexes. But, we do not believe it indicates bad faith in finding or disclosing documents which are pertinent to plaintiff's requests. Ultimately, the SD was found and was disclosed in full to plaintiff.

*Homesley index card*

52. Plaintiff has argued that the initial failure to supply plaintiff with the Homesley index card along with the Homesley affidavit, and the "doctoring" of the Homesley affidavit

by deleting a paragraph on the third page, is evidence of bad faith. The court disagrees. Defendant originally considered providing a copy of the Homesley index card to plaintiff and the court, even though the court did not order that the card be produced. At some point in the chain of custody of the affidavit, the paragraph referring to the production of the card was deleted and the card was not provided. Unfortunately, this change apparently was not recorded in the copies of the affidavit retained in the litigation file. Ultimately, defendant offered to supply plaintiff with "another" copy of the index card and did so upon the court's direction. The court has no reason to believe that any agent of defendant purposely or recklessly misled plaintiff or the court on this matter. Nor has plaintiff demonstrated prejudice from defendant's error.

### Delay in disclosing the existence of the SD

53. Plaintiff has asserted that defendant's delay in informing plaintiff of the existence of the SD is indicative of bad faith. Defendant discovered the SD on or about November 7, 1978. But, defendant did not mention its discovery to plaintiff until defendant filed a summary judgment motion on March 13, 1979. On February 2, 1979, defendant had referred the document to the Department of State for review regarding possible disclosure. Ultimately, after an administrative appeal, the SD was revealed in full to plaintiff approximately eight months after its discovery. The delay demonstrates some sluggishness by an agency busy with FOIA requests. But, we do not believe it shows bad faith. *See Maynard v. C.I.A., supra,* 986 F.2d at 564.

### Failure to disclose SSR after finding FSR

54. Plaintiff has argued that defendant's bad faith is indicated by defendant's failure to disclose the existence of SSR after FSR was disclosed. Both FSR and CD derive from SSR. However, neither FSR nor CD directly or indirectly . refer to SSR. One might surmise from the information contained in the FSR and CD that another document might exist at another office. But, we do not believe the failure to follow up on such conjecture demonstrates bad faith. As noted before, defendant's responsibility does not extend to following up "clues" to other documents. *Id.* at 560.

55. Plaintiff has requested that the court examine the entire file of the FSR *in camera.* We decline to do so because we do not believe it will advance any relevant inquiry in this case. The court has no reason to believe any other part of the file is relevant to plaintiff. *See Dunaway v. Webster,* 519 F.Supp. 1059, 1083 (N.D.Cal.1981) (no duty to release entire see reference document if it contains material unrelated to the subject of the request). Finally, the court does not share plaintiff's suspicion that defendant attempted to hide the SSR from plaintiff and, therefore, intentionally ignored any reference to it in the FSR or on the index card to the FSR. Since the FSR and SSR contain the same information, there is no reason to identify one and not the other.

### Answers to interrogatories

56. Plaintiff contends that defendant's answers to plaintiff's interrogatories warrant sanctions against defendant. Plaintiff has asserted several problems with defendant's responses to plaintiff's interrogatories. One of the problems alleged by plaintiff is that some of the answers were signed by defendant's attorney, rather than some representative of defendant who was not counsel in this case. We do not believe this was improper. *U.S. v. 58.16 Acres of Land,* 66 F.R.D. 570, 572 (E.D.Ill.1975); *see also Rea v. Wichita Mortgage Corp.,* 747 F.2d 567, 574 (10th Cir.1984); *Wilson v. Volkswagen of America, Inc.,* 561 F.2d 494, 508 (4th Cir. 1977); *cert. denied,* 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978).

57. Plaintiff further asserts that sanctions should be assessed against defendant because defendant failed to supplement answers to interrogatories or was tardy in doing so. Plaintiff also claims that some of defendant's answers were false. Before looking at specific interrogatory answers which plaintiff has identified as troublesome, the court shall address the general issue of delay in supplementing interrogatory answers.

58. The court believes the age of this case and the spasmodic activity in the case ac-

count for some of the interrogatory problems. Unfortunately, this case has lingered unresolved for an extraordinary period of time. Everyone involved in the case, including the court, bears some responsibility for the delay in completing this case. The relevant documents in this case have not been disclosed all at one time; instead they have been disclosed (to the court, if not always to plaintiff) fitfully over a period of years. There are a number of reasons for this. Defendant made mistakes in responding to search requests. In addition, plaintiff altered and expanded his search requests. At different times during this case plaintiff issued different sets of interrogatories to defendant. A total of 94 interrogatories were served by plaintiff on defendant. Many of these interrogatories had several subparts. During the lengthy course of this case, many different agents and counsel were assigned to work on this case for defendant. The different answers to questions or different approaches to issues in this litigation by the variety of counsel and agents for defendant, as those questions and issues have evolved with the sporadic disclosure of records and the disparate thrusts of plaintiff, led to some inconsistencies (perceived and real), confusion and errors. Defendant has supplemented its answers to certain interrogatories at various times in this litigation. The effort at supplementation was continued in defendant's response to plaintiff's motion for fees.

59. Given the extraordinary circumstances of this case, as the court has just attempted to explain, the court shall not direct a sanction against defendant for general delay in supplementing interrogatory answers. The basic purpose of the supplementation provisions of FED.R.CIV.P. 26(e) is to prevent prejudice and surprise. *Reed v. Iowa Marine and Repair Corp.,* 16 F.3d 82, 85 (5th Cir.1994). This case differs from the normal case where there is a trial at which the prejudice from the failure to supplement an interrogatory can be more easily judged. Here, it is difficult to discern surprise and prejudice, although when errors and confusion have occurred, the case has bogged down with charges of stonewalling and misrepresentation. On the whole, the court does not believe the delay in supplementing interrogatory answers has caused plaintiff significant prejudice or surprise. In most instances, the recent supplemental answers have not provided plaintiff with new information; instead, it was information which was already known by plaintiff. While the court does not want to condone unwarranted delay in answering or supplementing interrogatories, for the above-stated reasons the court does not believe a sanction for general delay is appropriate in this case.[1]

60. The court shall now turn to arguments plaintiff has made in its original and reply briefs concerning specific interrogatory answers. Plaintiff argues that defendant's answers to interrogatory # 1 are indicative of bad faith. Interrogatory # 1 asked, in part, whether it was possible that further records would be found pursuant to plaintiff's search requests. Defendant answered "no" to this interrogatory in April 1979, June 1979 and December 1982. However, additional documents were found between June 1979 and December 1982, albeit in response to new search requests. Understanding that defendant was not asked to consider the possibility of new and different search requests in interrogatory # 1, we believe defendant's answers to the interrogatory were substantially correct.

61. Plaintiff has objected to defendant's answers to interrogatories ## 49(c) and 55. The inconsistency in the answers to these interrogatories has been addressed previously in this case. Doc. No. 182. The inconsistency was caused by a mixup in which the agent answering the interrogatories was treating what we have labeled the SSR as the FSR and vice versa. In our opinion, and as we have previously held, this confusion was unintentional and not the product of bad faith. Defendant was sloppy in answering these interrogatories and later in checking the answers. See 7/21/86 declaration of Special Agent Chris Flynn at Doc. 114, affirming the original answers to the interrogatories.

---

**1.** Neither does the court want to reward the practice of filing numerous interrogatories, many of which exceed the permissible scope of discovery in this type of litigation. Plaintiff could be faulted for this in the instant case.

But, when defendant recognized the errors, supplemental answers were made and the matter was clarified. The court does not believe the mixup warrants the application of sanctions in this case.

62. Plaintiff refers from time to time to one sentence which is part of an attempted clarification to the answer to interrogatory # 55(b) by an Assistant U.S. Attorney. This was part of a letter dated July 15, 1991 in response to plaintiff's counsel's informal request. This sentence was in a paragraph relating to interrogatory # 55, although the letter mistakenly listed it as clarifying the answer to interrogatory # 53. The sentence stated: "The only time the actual copy of the SSR was sent to FBIHQ was at the time of plaintiff's FOIPA request and initiation of litigation." This statement is confusing to the court. Perhaps counsel meant to refer to the CD and not the SSR. We note that the letter states in introduction: "The additional information provided is not considered a supplement or amendment to previous answers to Interrogatories, but is merely an attempt to respond to your informal request for further explanation." The sentence in question was not repeated in Doc. No. 199 filed August 16, 1991 which refused to provide further information to supplement the answer to interrogatory # 55(b). Viewing this apparently erroneous comment in light of its somewhat informal context, the great number of interrogatories, the numerous efforts of defendant to supplement its answers to the interrogatories, and the failure of plaintiff to demonstrate surprise and prejudice from the statement, the court declines to sanction defendant because of the statement contained in counsel's July 15, 1991 letter.

63. Plaintiff objects that defendant never supplemented its answer to plaintiff's interrogatory # 18. This interrogatory asks for an explanation of statements in a supplement to defendant's first summary judgment motion, which regarded the reasons for defendant's mixup concerning the failure to disclose the existence of the CD. In the first summary judgment motion, defendant stated that the CD wasn't found in the initial search of KCFO, but in the supplement to the summary judgment motion defendant stated that the CD was found in the initial search but simply was not mentioned to plaintiff. Plaintiff lists three new questions on this topic which plaintiff contends defendant had a duty to answer. These new questions are different from those asked in the original interrogatory # 18. We do not believe defendant had a duty to anticipate them and supplement its answer accordingly. In addition, these questions concern a matter which occurred before this litigation was filed. For this reason, the questions are of little relevance to the main issue in this case, i.e., whether attorney's fees should be assessed against defendant for actions taken or omitted during the course of the case.

64. Plaintiff assails defendant's answers to interrogatories ## 20 and 41 wherein defendant defends the original decision to excise portions of the RD as "administrative markings." Plaintiff disagrees with this decision. While this decision may be controversial, the issue is academic since the RD was released in virtual entirety prior to the filing of this case.

65. Plaintiff contends that an explanatory note to an amended answer to interrogatory # 22 is incorrect and defendant failed to supplement the answer. The amended answer, which defendant submitted promptly to correct the original answer to the interrogatory, appears to be accurate. However, the note which accompanied the answer is incorrect and contradicts an affidavit filed by Special Agent Homesley approximately two months before the amended interrogatory answer was made. The court finds no bad faith, prejudice or surprise in this matter. The note is a parenthetical misstatement of a date previously supplied in an affidavit. It appears to have been offered in an effort to cure misunderstanding. Unfortunately, it may have had the opposite effect, although plaintiff has not demonstrated significant prejudice from this lapse. No sanction will be ordered in relation to defendant's response to interrogatory # 22.

66. Plaintiff next objects to defendant's answer to interrogatory # 40. In this interrogatory, plaintiff asked if defendant made a complete and thorough search for all records in all Department of Justice, FBI headquar-

ters and field office files, including ELSUR files. In response, defendant stated that a search was made only of the general index of the central records system of the field offices and the headquarters. The response further stated that ELSUR indexes were not searched under plaintiff's general request "as required by 28 C.F.R. § 16.3."[2] Plaintiff's objection returns to a point which has been discussed previously in this case, namely, whether defendant exhibited bad faith by not searching ELSUR files, in most instances, unless a specific request to search ELSUR files was made. Plaintiff is correct that the cited regulation does not expressly require a search request to list ELSUR files before ELSUR indexes will be searched. But, the language of the regulation is sufficiently broad that the court does not believe reliance upon the regulation for defendant's answer to interrogatory # 40 is indicative of bad faith.

67. Plaintiff attacks defendant's answer to interrogatories ## 50 and 62. These interrogatories ask under what names, subjects or categories, other than "Louis L. Frydman," are records regarding plaintiff indexed. Although the TSR was indexed under the name "Lewis Frydman" and discovered during a search of FBI Headquarters ELSUR files in September 1981, for several years defendant did not supplement its answer to interrogatories ## 50 and 62 to list "Lewis Frydman" as an index heading. We are aware of no prejudice or surprise to plaintiff because of the delay in supplementing the answers to interrogatories ## 50 and 62. Therefore, we shall not sanction defendant because of the delay.

68. Next, plaintiff objects to defendant's refusal to answer interrogatory # 68 which asks whether FBI offices to which copies of the CD were sent were made aware of the existence of the SSR. We do not believe defendant's objection to this interrogatory as being beyond the scope of the FOIA issues in this case is improper or evidence of bad faith.

Additionally, we note that the CD does not make a specific, parenthetical or indirect reference to the SSR.

69. Defendant's answer to interrogatory # 76 is objectionable to plaintiff as misleading and confusing. This interrogatory asks how the CD is indexed at the Albany Field Office. Defendant's answer is that such information is classified and that "this classification has been previously upheld. (See Interrogatory 73 *iii* )." We agree that the reference to Interrogatory 73 iii is unhelpful. This interrogatory simply reflects that the classification or nondisclosure of the CD has been affirmed by this court. It says nothing about indexing information, although it impliedly questions the relevance of interrogatory # 76 when the document in question has been held exempt from disclosure. Nevertheless, we have held virtually from the beginning of this case that defendant is not required to provide various explanatory information, including information relating to indexing, without a greater showing that defendant is withholding documents from plaintiff or otherwise acting in bad faith. In our opinion, plaintiff has never convincingly demonstrated an attempt by the government, since this case was filed, to withhold substantive documents which plaintiff was entitled to see. To this degree, we have upheld the "classification" of indexing information. Therefore, we will not assess sanctions on the basis of the answer in interrogatory # 76.

70. Next, plaintiff argues that defendant's answer to interrogatory # 80(c) should have been corrected. The answer to this interrogatory originally stated in response to a question about the so-called "Homesley index card" that plaintiff had received a copy of the card. This was incorrect at the time the answer was made. Plaintiff has since received a copy of the card, and the answer to interrogatory # 80(c) has been changed. We see no reason to assess sanctions on these facts.

---

**2.** Subsection (b) of the regulation provided during the pertinent time in this case:

(b) *Request should reasonably describe the records sought.* A request for access to records should sufficiently identify the records requested to enable Department personnel to locate them with a reasonable amount of effort.

Where possible, specific information regarding dates, titles, file designations, and other information which may help identify the records should be supplied by the requester. If the request relates to a matter in pending litigation, the court and its location should be identified.

71. Reviewing defendant's interrogatory answers and plaintiff's objections to them, the court firmly believes that defendant's efforts to answer the numerous interrogatories do not manifest bad faith or a recalcitrant or obdurate stance in this litigation. They do not provide good cause to award attorney's fees to plaintiff under FOIA.

72. A separate issue is whether sanctions should be imposed to enforce the Federal Rules of Civil Procedure and to encourage good litigation practice. While the court does not wish to condone unprofessional practice, neither does the court expect perfection. Here, we do not find malice or bad faith on defendant's part. There was no significant surprise or prejudice to plaintiff. Given the unusual circumstances of this case and the unintentional mistakes that were made, we do not believe a sanction would serve as an effective deterrent against future lapses. Nor do we believe a sanction on these facts would promote better litigation practice. Therefore, the court shall not impose sanctions.

*CONCLUSION*

The court shall deny plaintiff's motion for attorney's fees for the following reasons. Although the court finds that plaintiff is eligible for an award of attorney's fees, the court questions the value of the information disclosed to plaintiff because of this litigation. Second, no significant public interest has been furthered by this litigation. Plaintiff has been motivated by purely personal reasons. Any nonpersonal motivation or public benefit asserted by plaintiff in this matter is sheerly speculative and unconvincing to the court. Defendant has asserted reasonable grounds for withholding records or information in this case. Finally, while the government's conduct in this lengthy and difficult matter has been flawed in some respects, the court does not believe the government's mistakes are indicative of bad faith. Nor have the mistakes caused significant prejudice to plaintiff. The government has conducted an adequate search for the records requested by plaintiff. The government has disclosed those documents which were not exempt from disclosure. Finally, the government has not unreasonably, vexatiously, or obdu-rately resisted its duties under either the FOIA or the Federal Rules of Civil Procedure. For all of these reasons, plaintiff's motion is denied.

**IT IS SO ORDERED.**